278 So.2d 5 (1973)
Mrs. Josephine LISONBEE et al.
v.
CHICAGO MILL AND LUMBER COMPANY.
No. 52385.
Supreme Court of Louisiana.
May 7, 1973.
Rehearing Denied June 11, 1973.
*6 Lancaster, Baxter & Seale, E. H. Lancaster, Jr., Tallulah, for plaintiffs-applicants.
Sevier, Yerger & Sevier, Henry C. Sevier, Jr., Tallulah, William D. Carlson, Greenville, Miss., for defendant-respondent.
SUMMERS, Justice.
Josephine Lisonbee instituted this suit on her own behalf and for her three minor children claiming benefits under the Workmen's Compensation Act for the death of her husband William S. Lisonbee. She alleged that her husband, father of the minor children, met his death while in the employ of Chicago Mill and Lumber Company and while performing services arising out of and "incidental to" the course of his employment.
The trial court denied recovery. On appeal to the Second Circuit the judgment was affirmed, La.App., 259 So.2d 374. Certiorari was granted on plaintiff's application, 261 La. 771, 260 So.2d 700.
William S. Lisonbee had been employed for a year by Chicago Mill as a night watchman at their Tallulah, Louisiana, mill. The mill site comprised approximately 100 acres. A box factory, sawmill, lumber yard, office and miscellaneous buildings were situated on the premises. The whole acreage was enclosed by a wire fence on three sides. The fourth side, on the south, was unfenced, and a railroad track bounded the site here. Highway 80 (Green Street) bordered the mill site on the north.
Three watchmen were usually employed by Chicago Mill to detect fires and thefts, and to prevent unauthorized entry. Lisonbee's shift was at night. Watchmen were required to tour the mill grounds once each hour in a cart powered by a gasoline engine. The tour involved punching a time clock at 33 stations scattered about the complex. Each tour required about 45 minutes to complete.
Tours of inspection began and ended at a watchman's shack situated near the mill's main gate opening onto Highway 80. During the fifteen-minute intervals between tours of inspection, watchmen were expected to remain at the watchman's shack. This sheltered vantage point provided an unobstructed view of the main gate and a substantial part of the main mill, lumber yard, office building, etc. In this position unauthorized personnel could be denied entry at the main gate, and at the same time *7 the watchman on duty could maintain surveillance of the mill and lumber yard.
Although other employees of the mill were given breaks for meals during which they were allowed to leave the premises, the watchmen were not granted this liberty. Except to bring cart tires to a nearby service station for repair when necessary, the watchmen were expected to remain on the mill grounds. They were considered to be on duty and at work from the time their shift began until they were relieved by another watchman. Watchmen were paid by the hour, and no deductions were made for breaks of any kind, including meals. Lisonbee was authorized to carry his own gun while on duty.
On Sunday April 12, 1970 the mill was idle. Lisonbee had the 4 p. m. to midnight shift. He had made his hourly rounds of the plant site, punching the time clock stations as required. Usually Mrs. Lisonbee brought his evening meal about eight o'clock, but because of her church activities on this Sunday she was late. Therefore, in order to get a snack while waiting for his meal, Lisonbee left his station at the watchman's shack, walked out the main gate and crossed Highway 80 to Williamson's Grocery directly opposite.
While Lisonbee drank a carton of milk and chatted with Izola Williamson, the proprietor, and the clerk Jack McLaughlin, a Negro stranger named Charles Ballet entered the store. He ordered a candy bar, and when McLaughlin served him, Ballet shot him without provocation. Whereupon Lisonbee drew his gun and exchanged shots with Ballet. In the exchange Lisonbee received a fatal wound. Ballet was hit but fled, shooting twice at Izola Williamson as he left the store.
Section 23:1031 of the Workmen's Compensation Act provides that the employer shall pay compensation to the employee who "receives personal injury by accident arising out of and in the course of his employment." The terms arising out of, and in the course of are not synonymous. The former suggests an inquiry into the character or origin of the risk, while the latter brings into focus the time and place relationship between the risk and the employment. The two requirements cannot, however, be considered in isolation from each other. A strong showing by the claimant with reference to the arise-out-of requirement may compensate for a relatively weak showing on the during-course-of requirement, or vice versa. As a corollary it follows that whenever the showing with respect to both requirements is relatively weak a denial of compensation is indicated. Malone, Louisiana Workmen's Compensation, §§ 162, 192.
These concepts are developed from cases interpreting the spare phrases arising out of the employment, and in the course of the employment. But the question of which risk shall be included within the act and which shall be excluded cannot be decided by phrases. Each case must be determined from its own facts. Kern v. Southport Mill, 174 La. 432, 141 So. 19 (1932); Myers v. Louisiana Ry. & Nav. Co., 140 La. 937, 74 So. 256 (1917).
An accident occurs during the course of the employment when it occurs during the time of the employment and at a place contemplated by the employment. Kern v. Southport Mill, supra. Lisonbee was shot shortly after 8:10 p. m. on April 12, 1970. His employment hours on this day were from 4 p. m. to 12 midnight. Clearly, then, he incurred the fatal gunshot wound during the time of his employment. But the place of the employment presents a seriously controverted question.
As we understand plaintiffs' argument, although Chicago Mill may have had a company rule prohibiting watchmen from leaving its premises during their tour of duty, this rule was often violated, with the knowledge and acquiescence of the management of the mill.
Williamson's Grocery is located immediately across the street (Highway 80) from the main gate of the mill site, 75 feet *8 away. Plaintiffs' version is that watchmen on duty would cross the street to Williamson's Grocery to purchase tobacco, snacks or meals during the break between rounds, and this custom prevailed for many years. That is to say, it is contended that Williamson's Grocery was, with the tacit consent and acquiescence of the employer, considered to be a place where watchmen were authorized to be during their employment. In essence the argument attempts to supply the element of place associated with the time and place requirements ordinarily inquired into to determine course of employment.
The trial judge found, "There is little dispute that Lisonbee as well as the other watchmen were instructed not to leave the premises without first obtaining relief from another watchman or a supervisor." This conclusion is concurred in by the Court of Appeal by this finding: "Testimony of the officers of defendant is positive and unequivocal of the company's policy requiring that its watchmen be restricted to the premises during the entire interval of their daily employment." 259 So.2d 374, 375. Our review of the record supports these findings.
A short time before April 12, 1970 Lisonbee was observed by one of the mill superintendents several blocks away from the mill premises during working hours. This fact was reported to Lisonbee's superior who reprimanded him for violating company regulations. This evidence is in keeping with the testimony of company officials that they were planning to discharge Lisonbee for failing to properly perform his duties or to observe company regulations.
The trial judge found that Mrs. Lisonbee customarily brought her husband's lunch, delivering it to him at the main gate, and that she was not permitted beyond that point. He concluded this practice made it unnecessary for Lisonbee to go off the premises to the store for food. In the trial judge's opinion, the fact that watchmen had their meals brought to them corroborated the company policy that watchmen were not permitted to leave company premises while on duty.
He was further of the opinion, with which we agree, that Lisonbee's, or the other watchmen's, practice of leaving the mill premises while on duty to make purchases at the store has not been adequately established. For although Izola Williamson testified that company watchmen patronized her store, she could not say they did so while on duty. And while McLaughlin survived the melee, he was not called to testify. His failure to testify was not explained. Nor was it shown that this practice occurred with much frequency, or with the knowledge of company officials. If the practice did in fact exist, therefore, it did not evidence an acquiescence in the practice by the company contrary to its regulations. To the contrary, the reprimand received by Lisonbee shortly before April 12, 1970, when he was found to be off company premises during duty hours, belies such a conclusion.
The company policy not permitting watchmen to leave the premises, while other employees could, is explained by the need to maintain a continuous surveillance for fire, the watchman's paramount duty. It is for this reason, also, that no "break" was provided for watchmen, not even for meals, they being required to eat while on duty, maintaining all the while a lookout for fire.
In recognizing that compensation is allowable when the injury occurs in the course of the employment, the law contemplates that the employer is free to define the scope of his work, and to determine when and where the work shall be done. Thus when an employee abandons his post of duty in violation of orders or contrary to practices prevailing on the job, he is outside the course of his employment, and if he is killed or injured while so doing, compensation will be denied. Pierre v. Barringer, 149 La. 71, 88 So. 691 (1921); *9 Piske v. Brooklyn Cooperage Co., 143 La. 455, 78 So. 734 (1918); Broussard v. Farm Storage & Equipment, Inc., 236 So.2d 882 (La.App. 1970); Blake v. Fidelity & Casualty Co. of N. Y., 169 So.2d 608 (La. App.1964); Mabry v. Fidelity and Cas. Co. of N. Y., 155 So.2d 44 (La.App.1963); Leckie v. H. D. Foote Lumber Co., 40 So. 2d 249 (La.App.1949); Moss v. St. Paul-Mercury Indemnity Company, 35 So.2d 867 (La.App.1948); Thomas v. Godchaux Sugars, Inc., 33 So.2d 414 (La.App.1948); Nance v. United Fruit Co., 15 La.App. 316, 131 So. 738 (1930); Lawhorn v. Pettigrew, Inc., 12 La.App. 455, 125 So. 298 (1929); Willie v. Louisiana Long Leaf Lbr. Co., 8 La.App. 817 (1928); Watson v. Holmes and Barnes, 7 La.App. 210 (1927); Malone, Louisiana Workmen's Compensation § 166; 99 C.J.S. Workmen's Compensation § 222.
The conclusion is that although the accident happened during the time of employment, it did not happen at a place of employment. In fact, the employee was at the place of the accident contrary to company regulations. And his previous visits to the store, if they were frequent, which is doubtful, were not with the knowledge or consent of the employer, either expressed or implied. The accident did not, therefore, happen in the course of the employment.
This alone should ordinarily suffice to deny compensation. However, the claimant contends that notwithstanding the fact that Lisonbee was off the premises of the employer he was nevertheless performing his duties as watchman. This occurred, it is said, when Lisonbee continued his surveillance of the mill site and lumber yard from Williamson's Grocery directly across the street from the main gate. In doing so Lisonbee was, under this contention, engaged in an activity for and on behalf of his employer, and the accident of his death was, therefore, one arising out of his employment.
To "arise out of" the employment, the accident must be the result of some risk to which the employee is subjected in the course of his employment and to which he would not have been subjected had he not been so employed. Time, place and circumstance must determine this. Kern v. Southport Mill, supra. Add to this a consideration of the character of the risk, which means "The accident must be the result of some risk to which the employee is subjected in the course of his employment and to which he would not have been subjected had he not been so employed." Further explaining the quoted rule, Mr. Justice Provosty, as organ of the court, in Myers v. Louisiana Ry. & Nav. Co., 140 La. 937, 74 So. 256 (1917), said: "It ought to be sufficient that the nature of the employment was such that the risk from which the injury resulted was greater for the workman than for a person not engaged in the employment."
We think Judge Ayres correctly summed up the principles involved in these cases and the Workmen's Compensation Act when he wrote (259 So.2d 374, 377):
The principle underlying the enactment of the workmen's compensation statutethat those who enjoy the product of a business should ultimately bear the cost of injuries incident thereto makes sense only if the injuries bear some significant relationship to the business operation. Such a relationship must be determined with reference to the particular facts of each case inasmuch as there is no exact rule for such determination. The test for recovery in marginal cases is to what degree or limit the injured employee was subjected to the hazard causing the injury by virtue of his status as an employee, and to what degree the injured employee's activities at the time were at the direction of or in the interest of his employer.
The contention that Lisonbee continued his surveillance of the mill and lumber yard while he was in the grocery store is not supported by the facts. Although the view from the exterior of the store to the *10 mill site is unobstructed, the situation is different from within the building. The single front door permitting access was located on the west end of the store. Lisonbee entered here, turned to the right and walked past the two front windows to the opposite side of the store near the "coke" boxes. He had been there for ten minutes when Ballet entered. At this point his view of the mill site was impaired. As the trial judge found from a visit to the store, "vision and hearing was obstructed" (of the plant site) at that location. And, moreover, Lisonbee was engaged in "conversation and activity that diverted his attention from work." Thus, Lisonbee had abandoned his post and duties.
It cannot be contended that the activity was "at the direction of or in the interest of the employer." Lisonbee's presence at the store was, instead, purely a matter of personal convenience. His presence there was inimical to the interest of the employer. It is doubtful also that any rational argument could be advanced to support a finding that the accident was "the result of some risk to which the employee was subjected in the course of his employment and to which he would not have been subjected had he not been so employed," as the Myers case requires. Aside from the fact that we have found this accident did not occur in the course of Lisonbee's employment, the shooting by a stranger, entirely unprovoked, which obviously compelled Lisonbee to draw his gun, had no relation whatsoever to the employment.
Furthermore, the shooting did not involve Lisonbee alone, it involved all others at the sceneIzola Williamson and Jack McLaughlin also. Unforuntately for Lisonbee and the claimants, only Lisonbee's participation resulted in a fatality. Nevertheless, the risk was not greater for Lisonbee than it was for Izola Williamson or Jack McLaughlin who were not employed by Chicago Mills.
In summary, Lisonbee was not required to be in the store by his employment, he was not performing the duties prescribed by his employer, and he would have been subjected to the risk of Ballet's gun whether he was employed or not, just as Izola Williamson and Jack McLaughlin were. It cannot be said, therefore, that this accident was one arising out of his employment.
Only the time element of the various factors considered necessary to satisfy the arising out of and in the course of the employment requirements of the Workmen's Compensation Act has been met. This alone is not a proper basis for an award of compensation.
For the reasons assigned, the judgments of the trial court and Court of Appeal are affirmed.
BARHAM, J., dissents.
TATE, J., dissents with written reasons.
TATE, Justice (dissenting).
I respectfully dissent.
The majority applies the Pierre (1921) and Piske (1918) decisions of this court, which narrowly construed "course of" and "arising out of" employment so as to exclude as compensable injuries sustained during a minor deviation from the regular place of employment.
In doing so, our majority overlooks the more recent decisions of this court, such as Bates v. Gulf States Utilities Co., 249 La. 1087, 193 So.2d 255 (1966), and Edwards v. Louisiana Forestry Commission, 221 La. 818, 60 So.2d 449 (1952), as well as vastly preponderant modern jurisprudential interpretations. These do not penalize an employee for an injury sustained when he deviates slightly from the course of employment or attends to necessary personal needs (such as eating, as here) during the hours of employment.
Here, this watchman stepped across the street from his post at the factory entrance *11 when his wife did not show up with his evening meal. He bought a candy bar to eat. While in the store, an armed robber entered, and the watchman drew his gun and was shot and killed. I should note that the watchman carried a gun as a part of his duties, and the risk of his being shot if he attempted to use it to prevent unlawful acts was a part of the risks of his employment.
Because of alleged instructions that the watchman should not leave the premises, the majority denied recovery to this heroic employee's widow.
An employee protected by the Louisiana statute is entitled to receive workmen's compensation if disabled "by accident arising out of and in the course of his employment." LSA-R.S. 23:1031. In Kern v. Southport Mill, 174 La. 432, 141 So. 19, 21 (1932), a lead case, our Supreme Court stated that, for purposes of the workmen's compensation, act, (a) "an accident occurs in the course of an employment when it takes place during the time of such employment", and (b) it arises out of the employment when it is "the result of some risk to which the employee is subjected in the course of his employment to which he would not have been subjected had he not been so employed." (Italics ours.)
In noting that deviations from normal duties to aid third persons do not necessarily deprive an employee of the coverage of the compensation act, this court subsequently held that an employee's efforts to rescue a bystander from a dog were "reasonably within the scope of those things contemplated" by the employment, allowing compensation for disability incurred in a rescue attempt. Edwards v. Louisiana Forestry Commission, 221 La. 818, 60 So. 2d 449 (1952). Protection of the compensation act extends not only to disabilities incurred in the performance of employment duties, but also to activities reasonably connected with or incidental to them. Bates v. Gulf States Utilities Co., 249 La. 1087, 193 So.2d 255 (1966).
Similarly, injuries have been held compensable when resulting from acts of voluntary deviation from regular duties to accommodate third persons or for other purposes have been held to be within the course and scope of the employment. Green v. Heard Motor Co., 224 La. 1078, 71 So.2d 849 (1954); Harkness v. Olcott-Stone Motors, 203 La. 947, 14 So.2d 773 (1943). See Malone, Sections 167, 168, 175.
In the last decades our courts have repeatedly awarded compensation for injuries sustained by employees on a deviation from the place of employment to attend to personal needs, which are regarded as incidental to the employment since at least partially performed so that the employee could work better.
See, e. g.: Gray v. Broadway, 146 So.2d 282 (La.App.2d Cir. 1962) (truckdriver went home to get driver's license); Alexander v. Insurance Co. of Pa., 131 So.2d 558 (La.App.3d Cir. 1961) (worker went home to pick up workboots); St. Alexandre v. Texas Co., 28 So.2d 385 (La. App.Orl.1946), certiorari denied (employee left plant to obtain soft drink at stand a short distance away); Rigsby v. John W. Clark Co., 28 So.2d 346 (La.App.1st Cir. 1946), certiorari denied (bookkeeper injured when he left work premises to fix hanging charged wire which created danger to others); Clark v. Employers Liability Assur. Corp., 27 So.2d 464 (La.App.1st Cir. 1946) (employee injured on way to cafe to eat during workhours, where no eating facilities on premises.)
At least since the cited decisions in 1946, in which certiorari was denied (if not from the 1932 Kern v. Southport Mills decision, earlier cited), the courts have consistently held an employee protected during work hours, despite a minor deviation from instructions or place of work, if what he did could reasonably be contemplated as humanly incidental to his service as an employee and if not unreasonably increasing the risk of injury. See Malone, Louisiana *12 Workmen's Compensation Law, Sections 166-68 (1951).
The present majority holding is a throw-back to the overly technical and restrictive interpretations of the first decade of our compensation act, long since abandoned in view of the humane purposes of the act and the consistent legislative expansion of the scope of coverage and legislative approval of interpretations which held that employees are covered for injuries sustained during workhours, not only when actually performing the duties of employment, but also while performing acts of personal need reasonably connected therewith.
I respectfully dissent.